UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Donald Scott Bertram,

   Plaintiff,

   v.           Civil No. 5:14-cv-109-cr-jmc

Carolyn W. Colvin, Acting Commissioner
of Social Security Administration,

   Defendant.

## REPORT AND RECOMMENDATION
(Docs. 4, 8)

Plaintiff Donald Bertram brings this action under 42 U.S.C. § 405(g) of the Social

Security Act, requesting review and remand of the decision of the Commissioner of

Social Security denying his application for disability insurance benefits.  Pending before

the Court are Bertram's motion to reverse the Commissioner's decision (Doc. 4), and the

Commissioner's motion to affirm the same (Doc. 8).  For the reasons stated below, I

recommend that Bertram's motion be GRANTED, in part; the Commissioner's motion be

DENIED; and the matter be REMANDED for further proceedings and a new decision.

## Background

Bertram was 45 years old on his amended alleged disability onset date of

January 1, 2008.[1]  He has a high school education and attended college for approximately

---

[1]  Initially, Bertram alleged a disability onset date of August 1, 2009.  (AR 117, 275, 416.)  At the
October 14, 2011 administrative hearing, he amended that date to January 1, 2008.  (AR 211.)

one year.  (AR 608, 611.)  He has worked as a self-employed property caretaker (doing landscaping, home repairs, and general home maintenance), a snowplow operator, and a real estate broker.  (AR 68.)  He has also helped manage his wife's cottage-rental business.  (*Id.*)  He is married and has two grown children.  (*Id.*)

Bertram was active and healthy until approximately 1993, when he ruptured a disc in his back while working.  (AR 609, 611.)  Surgery helped relieve his back pain, allowing him to return to work until approximately 2001, when he reinjured his back, requiring a second surgery.  Thereafter, Bertram again returned to full-time work, gradually reducing to only part time by around 2004, with his wife working two jobs to help support the family.  (AR 64–65.)  Since then, Bertram has had chronic back pain radiating down his left leg.  He also has right knee pain, bilateral carpal tunnel syndrome (CTS) with pain and numbness in his wrists, inguinal hernias with multiple repairs, and blurred vision.  More recently, Bertram has been diagnosed with depression and anxiety, which appear to be connected with his chronic pain symptoms.  (AR 610–11.)

In December 2009, Bertram protectively filed an application for social security disability insurance benefits.  Therein, he alleged that, as of August 1, 2009,[2] he has been unable to work due to his back, leg, and knee pain; CTS in both wrists; multiple hernias; blurry vision; tinnitus; depression; and anxiety.  (AR 416.)  Bertram explained that, if he sits for more than one hour, he feels pain in his back and legs; and if he bends, lifts, shovels, rakes, or sweeps, his pain increases.  (*Id.*)  He further stated that he is "in

---

[2]  As noted above, Bertram amended his alleged disability onset date to January 1, 2008 at the October 14, 2011 administrative hearing.  (AR 211.)

constant pain" and "[m]ost days are a struggle just to leave the house and try to work." (*Id.*)  He explained that he can no longer do his lawn/home maintenance work because of pain, fatigue, and depression; and he is unable to do real estate work because he cannot sit for more than a couple hours at a time.  (*Id.*)

Bertram's application was denied initially and upon reconsideration, and he timely requested an administrative hearing.  The hearing was conducted on October 14, 2011 by Administrative Law Judge (ALJ) Thomas Merrill.  (AR 62–99.)  Bertram appeared and testified, and was represented by an attorney.  In addition, a vocational expert (VE) and Bertram's wife, Joni Bertram, appeared and testified at the hearing.  On November 16, 2011, the ALJ issued a decision finding that Bertram was not disabled during the relevant period.  (AR 117–31.)  Thereafter, the Appeals Council granted Bertram's request for review of that decision, vacated the decision, and remanded the case to the ALJ for further proceedings.  (AR 138–41.)  On July 31, 2013, ALJ Merrill held a second administrative hearing on Bertram's application.  (AR 38–61.)  Bertram again appeared and testified, and was represented by counsel.  A VE and Bertram's wife also appeared and testified again.  On September 24, 2013, the ALJ issued a second decision finding that Bertram was not disabled during the relevant period.  (AR 6–37.)  Thereafter, the Appeals Council denied Bertram's request for review, making the ALJ's decision the final decision of the Commissioner.  (AR 1–3.)  Having exhausted his administrative remedies, Bertram filed the Complaint in this action on May 28, 2014.  (Doc. 1.)

## ALJ Decision

The Commissioner uses a five-step sequential process to evaluate disability claims. *See Butts v. Barnhart*, 388 F.3d 377, 380–81 (2d Cir. 2004). The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b), 416.920(b). If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. §§ 404.1520(c), 416.920(c). If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether that impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"). 20 C.F.R. §§ 404.1520(d), 416.920(d). The claimant is presumptively disabled if his or her impairment meets or equals a listed impairment. *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's residual functional capacity (RFC), which means the most the claimant can still do despite his or her mental and physical limitations based on all of the relevant medical and other evidence in the record. 20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). The fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). Finally, at the fifth step, the ALJ determines whether the claimant can do "any other work." 20 C.F.R. §§ 404.1520(g), 416.920(g). The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that

there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566

F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step

five is limited, and the Commissioner "need not provide additional evidence of the

claimant's [RFC]").

Employing this sequential analysis in his September 24, 2013 decision, the ALJ

first determined that Bertram had engaged in substantial gainful activity (SGA) since his

amended alleged disability onset date of January 1, 2008, and thus was not disabled.  (AR

12–18.)  "In the alternative," the ALJ proceeded to adjudicate Bertram's claim under the

subsequent steps of the sequential analysis.  (AR 18.)  At step two, the ALJ found that

Bertram had the following severe impairments: degenerative disc disease of the lumbar

spine, patella-femoral dysfunction of the right knee, bilateral CTS, major depression, and

generalized anxiety disorder.  (*Id.*)  Conversely, the ALJ found that Bertram's inguinal

hernias and blurry vision were non-severe.  (AR 19.)  At step three, the ALJ found that

Bertram did not have an impairment or combination of impairments that met or medically

equaled the severity of a listed impairment.  (AR 19–22.)  Next, the ALJ determined that

Bertram had the RFC to perform "light work," as defined in 20 C.F.R. § 404.1567(b),

with the following restrictions:

> [Bertram] is able to walk up to [five] hours per day.  He is able to
> frequently balance but only occasionally stoop, kneel, crouch, crawl and
> climb ramps, stairs, ladders, rope or scaffolds.  He has sufficient
> concentration, persistence and pace to sustain for two-hour blocks of time
> throughout a normal workday and workweek in performing 3+[-]step low[-
> ]stress work activities.  [Bertram] is able to manage changes expected in
> routine-type work activities; and he is able to plan and set goals.

(AR 22.)  Given this RFC, the ALJ found that Bertram was capable of performing his past relevant work as a real estate agent.  (AR 27.)  Alternatively, based on testimony from the VE, the ALJ determined that Bertram could perform other jobs existing in significant numbers in the national economy, including the following representative occupations: survey worker, hand packer, toll collector, cashier, and fast-food worker. (AR 28–29.)  The ALJ concluded that Bertram had not been under a disability from the amended alleged disability onset date[3] through the date of the decision.  (AR 29.)

## Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A person will be found disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

---

[3] The ALJ misstates Bertram's amended alleged disability onset date on two different instances in his decision, first stating that the date is "August 1, 2009" (AR 10) and later stating that it is "August 1, 2008" (AR 29).  The ALJ's error is harmless, however, given his correct statement of the alleged onset date ("January 1, 2008") at the beginning of the decision.  (AR 9.)  The ALJ's confusion about the alleged onset date appears to have resulted from Bertram's and his attorney's confusion about that date at the first and second administrative hearings (*see* AR 50, 60, 65), despite having submitted a letter to the ALJ on October 14, 2011 requesting to amend the alleged disability onset date to "January 1, 2008" (AR 211).

In considering a Commissioner's disability decision, the court "review[s] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g).  The court's factual review of the Commissioner's decision is thus limited to determining whether "substantial evidence" exists in the record to support such decision.  42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder.").  "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Poupore*, 566 F.3d at 305.  In its deliberations, the court should bear in mind that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

## Analysis

Bertram makes the following arguments: (1) the ALJ failed to correctly evaluate his earnings from self-employment and thus erred in determining that he engaged in SGA during the relevant period; (2) the ALJ erred in finding that Bertram did not have an impairment or combination of impairments that medically equaled Listing 1.04 for disorders of the spine; (3) the ALJ failed to give adequate weight to the opinions of treating psychiatrist Dr. Ray Abney; and (4) the ALJ's credibility determination and step-

four finding that Bertram was capable of performing his past relevant work as a real

estate agent were not based on substantial evidence.[4]  For the reasons explained below, I

find that the ALJ erred in his determination that Bertram engaged in SGA during the

relevant period and in his analysis of the medical opinions.  Therefore, I recommend

remanding for further proceedings and a new decision.

## I.       The ALJ erred in finding that Bertram engaged in SGA during the relevant period.

As noted above, at step one of the ALJ's five-step sequential process, the claimant

bears the burden of proving that he or she did not engage in "substantial gainful activity"

during the period in question.  *Butts*, 388 F.3d at 383; *Rubinson v. Comm'r of Soc. Sec.*,

Civil Action No. 13–5178(JBS), 2015 WL 1384376, at *7, *13 (D. N.J. Mar. 25, 2015).

If the claimant was able to engage in SGA during that period, the claim is rejected

without consideration of the claimant's medical condition.  *Bell v. Comm'r of Soc. Sec.*,

105 F.3d 244, 245–47 (6th Cir. 1996); *see* 20 C.F.R. § 404.1571.  "Substantial gainful

activity" is "work activity that is both substantial and gainful."  20 C.F.R. § 404.1572.

Work is considered "substantial" if it "involves doing significant physical or mental

activities," regardless of whether it "is done on a part-time basis or if [the claimant]

do[es] less, get[s] paid less, or ha[s] less responsibility than when [he or she] worked

before."  *Id.* § 404.1572(a).  Work activity is "gainful" if it is "the kind of work usually

done for pay or profit, whether or not a profit is realized."  *Id.* § 404.1572(b).

---

[4]  Bertram also argues that the ALJ erroneously cited to another person's medical records in his decision, despite having stated at the first administrative hearing that the records would be removed from the file and despite the Appeals Council having ordered the ALJ to remove them.  (Doc. 4 at 12–13 (citing AR 19, 66, 140).)  As Bertram concedes, the error was harmless (Doc. 10 at 7), and thus there is no need for the Court to consider it here.

In cases involving a self-employed claimant like Bertram, the ALJ considers the claimant's activities and their value to his business in deciding whether he has engaged in SGA.  20 C.F.R. § 404.1575(a)(2).  The ALJ will not consider the claimant's income alone because the amount of income he actually receives may depend on "a number of different factors, such as capital investment and profit-sharing agreements."  *Id.*; *see* SSR 83-34, 1983 WL 31256, at *1 (1983) ("Self-employment income alone is not a reliable factor in determining SGA, since it is influenced not only by the [claimant's] services but also by such things as market conditions, capital investments, the services of other people, and agreements on distribution of profits.").  The ALJ determines whether a self-employed claimant has engaged in SGA by applying three tests:

> (i) Test [O]ne: You have engaged in substantial gainful activity if you render services that are significant to the operation of the business and receive a substantial income from the business . . . .
>
> (ii) Test Two: You have engaged in substantial gainful activity if your work activity, in terms of factors such as hours, skills, energy output, efficiency, duties, and responsibilities, is comparable to that of unimpaired individuals in your community who are in the same or similar businesses as their means of livelihood.
>
> (iii) Test Three: You have engaged in substantial gainful activity if your work activity, although not comparable to that of unimpaired individuals, is clearly worth the amount shown in § 404.1574(b)(2) when considered in terms of its value to the business, or when compared to the salary that an owner would pay to an employee to do the work you are doing.

20 C.F.R. § 404.1575(a)(2).  If a claimant has not engaged in SGA under Test One, the ALJ must consider whether he has engaged in SGA under Tests Two and Three.  *Id.*  For the reasons explained below, I find that the ALJ failed to adequately assess whether Bertram engaged in SGA during the relevant period under any of these three tests.

9

**A.     Test One, Part One: The ALJ did not err in finding that Bertram rendered significant services to the operation of his businesses.**

Test One requires that the ALJ consider whether the claimant "render[s] services that are significant to the operation of [his] business and receive[s] a substantial income from the business."  20 C.F.R. § 404.1575(a)(2)(i).  The test thus has two parts, requiring that the claimant (1) render significant services, and (2) receive substantial income.  Regarding the first requirement, a self-employed claimant renders "significant services" when he renders the services entirely by himself, or with someone else and he "contribute[s] more than half the total time required for the management of the business, or . . . render[s] management services for more than 45 hours a month regardless of the total management time required by the business."  20 C.F.R. § 404.1575(b)(1); *see* SSR 83-34, at *2.

Here, considering mainly Bertram's and his wife's testimony at the administrative hearings, the ALJ concluded that, from 2008 through 2011, Bertram worked without assistance as a real estate agent; rendered significant services to the operation of his property-caretaking business; and did much of the work associated with his wife's cottage-rental business, at least after 2009 when his wife began working two jobs totaling 40 hours per week.  (AR 14–18.)  The ALJ accurately described Bertram's work associated with the property-caretaking business as follows:

> [Bertram] was operating a lawn care and home repair service, which involved lawn mowing, raking, gardening/weeding, making runs to the local dump, general maintenance, putting up storm windows, turning off outdoor faucets, shoveling, snow plowing, painting, and making roof or other home repairs . . . .

(AR 16.)  The ALJ reasonably rejected the contention that Bertram's wife performed

50% of the work associated with the property-caretaking service, explaining:

> [Bertram's] wife works another full-time job as an office administrator.
> The tax records reflect that [Bertram] is the self-employed, sole proprietor
> of the lawn care and maintenance business.  The same records identify
> [Bertram's] wife as an office assistant.  The wages noted within the returns
> were hers.  She also was running a cottage[-]rental business, raising a
> question as to whether she could really be doing 25 to 50 percent of the
> work associated with [Bertram's] property-caretaking business.

(AR 15.)  The ALJ also accurately pointed out Bertram's testimony at the July 2013

administrative hearing that his wife was no longer helping with the property-caretaking

business, other than "doing the books" and shoveling when Bertram plowed.  (*Id.*; *see*

AR 52.)  Regarding the cottage-rental business, the ALJ accurately stated:

> Despite [Bertram's] testimony at the two hearings before me that he has cut
> back on the amount of hours he devotes to his property-caretaking business,
> the totality of the record . . . establishes [that he] still does significant work
> for it, and even contributes to the operation of his wife's cottage[-]rental
> business.  [Bertram] testified that he answers telephone calls at the [cottage-
> rental] business and unlocks doors; and he implied he has some role in
> hiring contractors needed to make repairs, such as plumbers and
> electricians.  He also indicated that he does some lawn mowing as well . . . .
> Considering [Bertram's] spouse was working another full-time job as an
> office administrator . . . , it stands to reason [Bertram's] contribution to the
> operation of his wife's cottage[-]rental business is likely somewhat more
> significant than he has indicated, especially since the background of his
> business is in property maintenance/grounds[-]keeping-type work.

(AR 14.)  Later in his decision, the ALJ noted that, "between [Bertram's] part-time work

for his property-caretaking business, his activities as a realtor[,] and the work he performs

with respect to his wife's cottage[-]rental business, [he] was arguably putting forth more

effort, work, time[,] and attention than would typically be required of most full-time

employment."  (AR 16.)  Despite Bertram's wife's October 2011 letter stating that she

contributed 50% of the work to Bertram's property-caretaking business (AR 352), I find that the record supports the ALJ's conclusion that Bertram provided services that were significant to the operation of his self-employment businesses during the relevant period. (*See, e.g.*, AR 40–53, 68–69, 76, 83–85, 87–88, 437, 484.)  Thus, the first part of Test One is satisfied.

> **B.    Test One, Part Two: By relying on gross income rather than net, the ALJ erred in finding that Bertram received a substantial income from his businesses.**

The ALJ also found that Bertram satisfied the second part of Test One, determining that he received a "substantial income" from his self-employment businesses.  20 C.F.R. § 404.1575(a)(2)(i).  (*See* AR 16–18.)  A claimant receives "substantial income" if his or her "countable income" either averages more than the amounts prescribed by the Earnings Guideline Tables in 20 C.F.R. § 404.1574(b)(2)[5], or is comparable to what the claimant earned before he became disabled or to that of an unimpaired self-employed individual in the same community or similar line of business. *Id.* at § 404.1575(c)(2).  "Countable income" is determined by first deducting "normal business expenses" from gross income to determine net income, and then deducting other expenses, such as "the reasonable value of any significant amount of unpaid help furnished by [the claimant's] spouse, children, or others."  *Id.* at § 404.1575(c)(1).

---

[5]  *See* POMS DI 10501.015(B), available at https://secure.ssa.gov/apps10/poms.nsf/lnx/0410501015 (last visited May 6, 2015), indicating that, in the calendar years 2008 through 2011, "countable income" is deemed "substantial" if it averages more per month than $940, $980, and $1000, respectively.

The ALJ stated multiple times in his decision that Bertram's net income from 2008 to 2011 fell below SGA levels, but the ALJ attributes this low income to Bertram's use of "normal tax accounting principles," implying that these principles do not apply when determining a claimant's SGA.  (*See* AR 13 ("[Bertram's] net income as indicated on earnings records suggests he earned income below the amount presumed to equate to SGA-level work because of his use of normal tax accounting principles available to all self-employed workers regardless of disability"), 14 ("although my review of [Bertram's] income tax records reflects [that his] net income from his real estate commissions and property-caretaking business is below [SGA] levels, these figures are derived through tax and accounting procedures"), 18 ("[Bertram's] net earnings fall under the SGA level through the use of normal tax accounting principles available to all self-employed taxpayers, regardless of disability").)  Yet the ALJ improperly used Bertram's *gross income*, instead of Bertram's net income, to determine that Bertram was receiving "substantial income," listing the gross income numbers from 2008 through 2013 in his decision (AR 17) and concluding that Bertram "received a substantial income from [his] businesses" (AR 18).[6]  *See Gaudreau v. Comm'r of Soc. Sec.*, 160 F. Supp. 2d 285, 294

---

[6]  Although the ALJ does not appear to have relied on Bertram's gross receipts in making his SGA decision, in his initial discussion of Bertram's income during the relevant period, the ALJ confusingly details Bertram's gross *receipts*, as reported in the applicable Forms 1040-Schedule C, and incorrectly refers to these amounts as gross *income*.  (*See* AR 13–14 (listing Bertram's gross income from the property-caretaking business as: $31,139 in 2008, when in fact it was $26,312 (AR 307); $24,909 in 2009, when in fact it was $22,756 (AR 327); $16,275 in 2010, when in fact it was $11,737 (AR 348); $24,415 in 2011, when in fact it was $20,759 (AR 365); and $29,327 in 2012, when, in fact, gross income was $24,646 (AR 369).)  For each tax year Bertram's Schedule C gross income is less than gross receipts, as the ALJ appears to acknowledge later in his decision by referencing the accurate amount of Bertram's gross income reported on Schedule C per year.  (*See* AR 17.)

(D. Conn. 2001) ("ALJ committed error as a matter of law in relying upon the gross sales of the business rather than plaintiff's net income in deciding that he was engaged in substantial gainful activity").  The ALJ explained that, although Bertram "may have been working part[]time during the period in question, . . . he has been earning *gross wages* well above [SGA] levels."  (AR 18 (emphasis added).)  Significantly, the ALJ then stated: "[Bertram's] net earnings fall under the SGA level *through the use of normal tax accounting principles available to all self-employed taxpayers, regardless of disability*." (*Id.* (emphasis added).)  As noted earlier, in other parts of his decision, the ALJ made similar statements.  (*See* AR 13 (net income suggests income below the amount presumed to equate to SGA-level work "because of his use of normal tax accounting principles available to all self-employed workers regardless of disability"), 14 (income tax records reflect net income below SGA levels, but "these figures are derived through tax and accounting procedures, such as depreciation of [Bertram's] assets used in his business").)

These statements suggest an incorrect assumption by the ALJ: that normal tax accounting principles and procedures, including depreciation of assets, are not relevant in determining whether a claimant engaged in SGA under Test One.  But neither the ALJ nor the Commissioner cites to any law in support of this proposition, and I am unable to find any.  Rather, as stated above, the applicable regulation explicitly requires the deduction of "normal business expenses" from gross income to determine net income, and further, the deduction of "the reasonable value of any significant amount of unpaid help furnished by [a claimant's] spouse, children, or others."  20 C.F.R. § 404.1575(c)(1). The regulation explains: "That part of your income remaining *after we have made all*

*applicable deductions* represents the actual value of work performed.  The resulting amount is the amount we use to determine if you have done [SGA]."  *Id.* (emphasis added); *see Rubinson*, 2015 WL 1384376, at *13 n.13 (deriving plaintiff's net income from Schedule C of plaintiff's tax returns and stating that "Schedule C constitutes an appropriate measure of [p]laintiff's net income, i.e., countable income for SGA purposes, because it accounts (and allowed [p]laintiff to deduct) for 'normal' business expenses"); *Kohnen v. Colvin*, Case No. 13–cv–03893–NJV, 2014 WL 2568886, at *4 (N.D. Cal. June 6, 2014) ("As a self-employed contractor, [plaintiff] would be entitled to deduct his work-related expenses from his monthly income before including that income in the SGA calculation.").

    The record establishes that Bertram had work-related expenses—including for example gasoline, truck repairs, equipment maintenance, telephone bills, insurance, and advertising—and did not bring home his gross income.  (*See, e.g.*, AR 327, 348, 365, 369, 544–47.)  These expenses should have been subtracted from Bertram's gross income to reach his net income.  By the ALJ's own repeated admission in his decision, had the ALJ used Bertram's net, rather than gross, income, he would have found that Bertram had not received a "substantial income," as defined in 20 C.F.R. § 404.1575(a)(2)(i), during the relevant period.  (*See* AR 13, 14, 18.)  Additionally, the ALJ's calculation of Bertram's wages by multiplying the number of hours worked by $45 per hour, based on Bertram's testimony that he made that amount (*see* AR 16–17), was improper, because the record does not indicate that Bertram either charged or earned $45 per hour in the relevant years (*see, e.g.*, AR 498–502, 510).

In sum, the ALJ erred by considering Bertram's gross income rather than net income in determining whether Bertram received a substantial income under the second part of Test One.  Although not explicit, the Commissioner appears to concede this point, stating as follows in her motion: "[W]hether the ALJ incorrectly considered Mr. Bertram's gross and not net wages is of no consequence, since the ALJ ultimately agreed with Mr. Bertram that his net wages from 2008 to 2012 fell below [SGA] levels."  (Doc. 8 at 13.)  The Commissioner then proceeds to argue that Bertram's countable income was "comparable to what it was before [Bertram] became impaired."  (*Id.* (citing 20 C.F.R. § 404.1575(c)(2)(ii)).)  Not only does the record not support this argument (*see, e.g.*, AR 50–51, 73–74, 86, 292, 295–96, 327, 429, 432), but the Court need not consider it because the ALJ did not include this analysis in his decision.  *See Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999) (quoting *Burlington Truck Lines, Inc. v. U.S.*, 371 U.S. 156, 168 (1962)) ("A reviewing court 'may not accept appellate counsel's *post hoc* rationalizations for agency action.'").

### C. Tests Two and Three: the ALJ's analysis is insufficient.

The ALJ also erred in his analysis of whether Bertram engaged in SGA under Test Two, because he failed to sufficiently develop the record to establish that Bertram's services were comparable to that of an unimpaired individual.  Social Security Ruling 83-34 provides that, "where there is any doubt as to the comparability or worth of services, it will be necessary to obtain evidence in appropriate detail, supplemented as required by opinions from authoritative sources in the community."  SSR 83-34, 1983 WL 31256, at

*10.  The Ruling further states that development of data and evidence must be specific:

"[g]eneral descriptions are considered inconclusive evidence for the point-by-point

comparison that is required.  If only a general description is possible or available, any

doubt as to the comparability of the factors should be resolved in favor of the impaired

individual."  *Id.* at *9; *see Gewecke v. Astrue*, No. 4:09CV3137, 2010 WL 2545560, at *6

(D. Neb. June 18, 2010); *Schlosser v. Astrue*, 546 F. Supp. 2d 664, 669 (E.D. Mo. 2007)

(finding ALJ's application of Test Two inadequate, where ALJ "described plaintiff's

activities and concluded that they were comparable to that of an unimpaired individual

without a specific evidentiary basis").  SSR 83-34 continues:

> Evidence of the impaired individual's activities accompanied by a
> statement that the work is comparable to the work of unimpaired persons is
> insufficient for a sound decision.  If necessary, a description should be
> obtained through a personal interview with an unimpaired self-employed
> individual from the selected group.  It may be necessary to have a more
> comprehensive description of the impaired individual's activity than that
> which can be provided by the impaired person.  Contact, therefore, should
> be made with people having firsthand knowledge of the impaired
> individual's work situation obtained through actual participation or
> observation.

SSR 83-34, at *9; *see Downes v. Barnhart*, 289 F. Supp. 2d 1072, 1074–75 (S.D. Iowa

2003) (case remanded to ALJ, where court could find "no evidence in th[e] record which

passes muster on the . . . standard [set forth in SSR 83-34]" to support ALJ's finding that

claimant was "performing work activity comparable to the salary that an owner would

pay an employee to do the same work"); *Gyore v. Astrue*, No. CV–07–13–PHX–DGC,

2008 WL 490623, at *2 (D. Ariz. Feb. 20, 2008) ("Because the ALJ provided only a bare

conclusion that Plaintiff's activities constitute comparable worth, and failed to engage in the detailed analysis required by SSR 83-34, the ALJ erred.").

The only explanation given by the ALJ for his conclusion that Bertram's work is "comparable to that of unimpaired individuals in his community who are in the same or similar businesses" is that: "[t]his conclusion . . . is supported by the analysis of [Bertram] earning above the [SGA] level," and Bertram's work activity "only increased" when his wife started working on a full-time basis. (AR 18.) For the reasons stated above, these findings are inadequate and unsupported by the record.

Finally, the ALJ did not analyze Bertram's work activity under Test Three, which considers the worth of that activity "when considered in terms of its value to the business, or when compared to the salary that an owner would pay to an employee to do the work [the claimant is] doing." 20 C.F.R. § 404.1575(a)(2)(iii). Accordingly, I find that the ALJ failed to adequately assess whether Bertram engaged in SGA during the relevant period under all three tests provided in the applicable regulation. Despite this finding, because the ALJ proceeded to consider the remaining steps of the sequential analysis "[i]n the alternative" (AR 18), remand is appropriate only if the ALJ's further analysis is either erroneous as a matter of law or not supported by substantial evidence, or if the ALJ relied heavily on the step-one SGA finding in assessing Bertram's credibility or determining his RFC. *See, e.g.*, *Cantu v. Astrue*, No. CV–10–335–CI, 2012 WL 553141, at *4 (E.D. Wash., Feb. 21, 2012) (even if ALJ erred in finding plaintiff engaged in SGA at step one, error was harmless because alternative findings at subsequent steps were properly supported); *Geister v. Astrue*, Civil No. 09–347–KI, 2010 WL 2867954, at *4

(D. Or. July 20, 2010) (ALJ error in determining plaintiff engaged in SGA was harmless because ALJ proceeded through other steps of sequential process "to be thorough"; ALJ did not solely rely on plaintiff's ability to engage in SGA in evaluating plaintiff's credibility and functional limitations; and substantial evidence supported ALJ's conclusion that plaintiff was not disabled during relevant period).

As explained below, I find that the ALJ erred in his analysis of the medical opinions, and thus I recommend remanding for further proceedings.

## II. Substantial evidence supports the ALJ's finding that Bertram's spine impairment did not meet or medically equal the severity of Listing 1.04.

Before addressing Bertram's claims regarding the medical opinions, I find that Bertram's claim regarding Listing 1.04 for disorders of the spine lacks merit. Bertram concedes that he has not *met* Listing 1.04, but argues that the ALJ should have assessed whether the combination of his degenerative disc disease and other impairments were of "equal medical significance" to the Listing.

For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is "equivalent" to a listed impairment, he must present medical findings equal in severity to "*all* the criteria for the one most similar listed impairment." *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990) (citing 20 CFR § 416.926(a) (1989)). The Social Security Administration has explained that a determination regarding whether a claimant's impairment or combination of impairments is medically the equivalent of a listed impairment "must be based on medical evidence demonstrated by medically acceptable clinical and laboratory diagnostic techniques, including

consideration of a medical judgment about medical equivalence furnished by one or more

physicians designated by the Secretary."  SSR 86-8, 1986 WL 68636, at *4 (1986),

*superseded on other grounds by* SSR 91-7c, 1991 WL 231791 (Aug. 1, 1991).

> For a claimant to meet or equal the severity of Listing 1.04, he must suffer from:

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord.  With:

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

> or

> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;

> or

> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and *resulting in inability to ambulate effectively*, as defined in 1.00B2b.

20 C.F.R. pt. 404, subpt. P, app. 1 § 1.04 (emphasis added).  "Inability to ambulate

effectively" is defined in the Listings as follows:

> an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities.  Ineffective ambulation is defined generally as having insufficient lower extremity functioning . . . to permit

independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

*Id.* at § 1.00(B)(2)(b)(1).

The ALJ found that Bertram did not meet or medically equal Listing 1.04 because the medical records "do not show objective evidence of nerve root compression during the period under review, and clinical examinations show negative straight[-]leg testing; further, there is no evidence of spinal arachnoiditis or lumbar spinal stenosis.  In addition, . . . the medical evidence of record shows that [Bertram] maintains a mostly normal gait and station, and normal motor function."  (AR 20.)  For the most part, the medical record supports these findings.  (*See, e.g.*, AR 622, 643, 654, 695.)  Yet Bertram asserts that "[i]t can be argued that he had motor or sensory loss"; and that his degenerative disc disease, chronic pain, and osteoarthritis of the knees "could have been deemed to be medically equivalent to the [L]isting."  (Doc. 10 at 8.)  It was Bertram's burden to demonstrate that his impairments *did* meet or medically equal a listing, not that they "could have" done so.  Bertram fails to point to any evidence demonstrating that his combination of impairments meets or medically equals Listing 1.04; the evidence he cites in support of this proposition falls far short.  For example, Bertram cites to a consultative examination report which states that Bertram has "some imbalance related to low back pain and weak left leg, giving some gait disturbance at times."  (*Id.* at 7 (citing AR 621).)  Having "some imbalance" and "some gait disturbance at times" is much less debilitating than Listing 1.04's requirement that the claimant be unable to ambulate effectively, meaning having an impairment which "interfere[es] very seriously with the individual's ability to

21

independently initiate, sustain, or complete activities."  20 C.F.R. pt. 404, subpt. P, app. 1
§ 1.00(B)(2)(b)(1).

Thus, I conclude that the ALJ did not err in finding that Bertram's impairments
did not meet or medically equal the criteria of Listing 1.04.

### III.    The ALJ erred in his analysis of the medical opinions.

Next, Bertram asserts that the ALJ failed to give adequate weight to the opinions
of treating psychiatrist Dr. Ray Abney.  Dr. Abney began treating Bertram in December
2009 based on a referral from Bertram's primary care physician, Dr. Robert Tortolani.
(AR 910.)  After a diagnostic interview, Dr. Abney diagnosed Bertram with major
depressive disorder and prescribed Zoloft and Wellbutrin.  (AR 665.)  In August 2010,
Dr. Abney opined that Bertram was "totally disabled" and unable to return to work unless
his back pain was better relieved.  (AR 661.)  In January 2012, Dr. Abney opined that
Bertram had marked restriction in activities of daily living; marked difficulties with
maintaining social functioning; a significant-to-marked decrease in concentration,
persistence, and pace; and repeated episodes of decompensation into depression but not
to the point of hospitalization.  (AR 912.)  Dr. Abney explained: "The extent and
persistence of [Bertram's] depression is quite pervasive and affects most aspects of his
life."  (*Id.*)  The Doctor further stated that, although "[p]rogress notes do not clearly
express his sense of desperation and hopelessness," Bertram "rarely goes anywhere or
does anything he used to enjoy [and is] uncomfortable around people because he 'looks
OK' but cannot work."  (*Id.*)  Dr. Abney stated that Bertram can do physical activities,
but is "constantly on guard or he'll end up bedridden the next day from pain."  (*Id.*)  Over

a year later, in July 2013, Dr. Abney stated there were no changes from his January 2012

opinion, stressing that Bertram's inability to work was a result of both his physical

limitations (including pain and lack of endurance) and his depression.  (AR 913.)  Dr.

Abney explained:

> [A]lthough I can at times give him some relief with medications and
> therapy, his relief is short[-]lived because he remains limited by physical
> pain . . . and this damages any improvement in mood or self[-]esteem . . . .
> *Unless some new treatment becomes available to fix his disc disease and
> pain*, so he can work steadily, I believe he'll remain trapped in depression
> and pain.

(*Id.* (emphasis added).)

Regarding the likelihood of Bertram's disc disease and pain improving, after

performing RFC testing on Bertram and reviewing the medical record, consultant Dr.

Karen Huyck—who specialized in occupational and environmental medicine—opined in

October 2011 that Bertram had already had "expert and appropriate care for his recurrent

disc herniations," and that, "[g]iven the extensiveness of his treatment and given that he

has exhausted conservative care, he is not expected to improve in any significant way in

the next 12 months, and in fact, this is a chronic condition."  (AR 885.)  Dr. Huyck

further opined that Bertram was "unable to tolerate more than eight hours of work per

week that are completely flexible as to when they are scheduled, which is not consistent

with substantial gainful employment."  (AR 885–86.)  Treating primary care physician

Dr. Tortolani, who treated Bertram's chronic pain, depression, and other physical

problems from approximately 1994 through 2013, concurred with Dr. Huyck's opinions.

(AR 897; *see* AR 652–55, 703–06, 841–76, 916–19.)

The ALJ afforded "little weight" to Dr. Abney's opinions (AR 26) and "limited weight" to Dr. Huyck's[7] and Dr. Tortolani's opinions (AR 27), instead relying on the opinions of nonexamining agency consultants Drs. William Farrell and Ellen Atkins and examining consultant Michael Italia, M.A. (AR 25–26).  As Bertram points out, however, Dr. Farrell, Dr. Atkins, and Italia each made their respective opinions in 2010 (*see* AR 608–13, 624–41, 670–87), over a year before Dr. Abney made his January 2012 opinions and also prior to Drs. Huyck and Tortolani making their opinions.  Thus Dr. Farrell, Dr. Atkins, and Italia did not consider the significant opinions of a treating physician (Dr. Tortolani), a treating psychiatrist (Dr. Abney), and an examining physician (Dr. Huyck). Italia never treated Bertram, and Drs. Farrell and Atkins never even examined or interviewed him, as Drs. Abney and Tortolani did many times.  Generally, where there are conflicting opinions between treating and consulting sources, the "consulting physician's opinions . . . should be given limited weight."  *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990).  This is particularly true where the consulting sources did not examine the claimant and made their opinions without considering all the relevant medical information (here, Dr. Abney's January 2012 and July 2013 opinions and Dr. Huyck's and Dr. Tortolani's October 2011 opinions).  *See Vargas v. Sullivan*, 898 F.2d 293, 295 (2d Cir. 1990) ("The general rule is that . . . reports of medical advisors who have not personally examined the claimant deserve little weight in the overall evaluation of disability.") (internal quotation marks omitted); *Tarsia v. Astrue*, 418 F. App'x 16, 18 (2d

---

[7]  The ALJ incorrectly refers to Dr. Huyck as Bertram's "treating physician."  (AR 27.)

Cir. 2011) (medical consultant's assessment deemed incomplete where it was unclear whether he reviewed all of the evidence, including in particular "the evaluation, radiographic, and diagnostic notes of . . . an orthopedist who diagnosed [claimant] with severe degenerative arthritis of the left knee and found her to be a candidate for total knee arthoplasty") (internal quotation marks omitted).

Under the treating physician rule, a treating physician's opinions must be given "controlling weight" when they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). Even when a treating physician's opinions are not given controlling weight, the regulations require the ALJ to consider several factors—including the length of the treatment relationship, the frequency of examination, whether the opinions are supported by relevant evidence and consistent with the record as a whole, and whether the physician is a specialist in the medical area addressed in the opinions—in determining how much weight they should receive. *Id.* at § 404.1527(c); *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008). In addition, the regulations provide that the ALJ "will always give good reasons in [his] . . . decision for the weight [he] give[s] [to the claimant's] treating source's opinion." 20 C.F.R. § 404.1527(c)(2); *see Schaal v. Apfel*, 134 F.3d 496, 503–04 (2d Cir. 1998).

Considering these factors, the ALJ gave several reasons for affording little weight to Dr. Abney's opinions. (*See* AR 26–27.) Taken together, I do not find these reasons sufficient. First, as noted above, the ALJ should have given more weight to Dr. Abney's opinions due to his status as a treating physician who treated Bertram frequently (on an

approximately monthly basis from 2009 to 2013) (*see, e.g.*, AR 666–68, 696–702, 878–82), especially when compared to the opinions of Drs. Farrell and Atkins, who never met or examined Bertram.  Second, although the ALJ correctly noted that Dr. Abney was a psychiatrist and not an internist (AR 26), the Doctor was still qualified to make an opinion about how Bertram's pain affected his mental functioning and ability to work, particularly given that Bertram's depression is closely connected with his pain issues.  Third, the ALJ properly noted that Dr. Abney's August 2010 opinion included a "conclusory statement . . . that [Bertram] was disabled, which is an issue that is reserved to the Commissioner."  (*Id.*)  *See Snell*, 177 F.3d at 133–34 ("The final question of disability is . . . expressly reserved to the Commissioner.").  But it does not follow that the Commissioner was free to disregard Dr. Abney's opinions entirely.  *Id.* at 134.  The Second Circuit explained: "Reserving the ultimate issue of disability to the Commissioner relieves the Social Security Administration of having to credit a doctor's finding of disability, but it does not exempt [ALJs] from their obligation . . . to explain why a treating physician's opinions are not being credited."  *Id.* (citations omitted); *see* SSR 96-5p, 1996 WL 374183, at *3 (1996) ("The [ALJ] is required to evaluate all evidence in the case record that may have a bearing on the determination or decision of disability, including opinions from medical sources about issues reserved to the Commissioner.").

Fourth, the ALJ stated that Dr. Abney's opinions are neither supported by Bertram's treatment record nor consistent with the record as a whole.  I find that substantial evidence does not support these findings.  Regarding supportability, the

Commissioner argues that the record contains "benign findings" related to Bertram's back and knee pain and CTS, and in fact, Dr. Abney's own treatment notes indicate that Bertram showed improvement in his depressive symptoms with medication.  (Doc. 8 at 17–18.)  The record taken as a whole, however, demonstrates that Bertram's improvements were not long-term.  As Dr. Abney noted[8] (AR 910, 912), the ALJ emphasized treatment notes indicating improvement and ignored those showing no improvement or worsening depression.  (*See, e.g.*, AR 668 ("not feeling as good as before[,] feelings of I don't care"), 702 ("[h]asn't enjoyed things for 7 years, hasn't enjoyed his motorcycle for 2+ years[,] . . . [f]eels down . . . [and] useless"), 882 ("stays home while family goes places/does things[,] . . . [g]etting by but barely").)  The Commissioner also argues that Dr. Abney's opinions are not supported because Bertram had "limited physical treatment" for his back, knee, and carpal tunnel conditions during the relevant period.  (Doc. 8 at 17.)  But the record reflects that Bertram had exhausted his treatment options (including two back surgeries and several hernia repairs), particularly regarding his back pain, and was still left with chronic pain which was unlikely to lessen or go away.  (*See, e.g.*, AR 444, 464, 862, 868–70, 873–75, 885, 918.)

As discussed above, Dr. Abney's opinions are also consistent with those of examining consultant Dr. Huyck and treating physician Dr. Tortolani.  Dr. Huyck opined in October 2011 that Bertram met the criteria of Listing 1.04 for disorders of the spine, as

---

[8]  Dr. Abney stated: "[The ALJ] says my opinion is inconsistent with my records which show improvement, yet ignores my records when they show loss of comfort or increase in depression. Symptoms being partially alleviated by medication reflect changes over time, but improvement does not persist.  [Bertram] remains markedly impaired."  (AR 912.)

he had lower back pain and left lower extremity pain consistent with left L5 radiculopathy, limited range of motion of the spine, motor loss of left foot dorsiflexion, and sensory loss of L5 distribution on the left side, resulting in "an inability to perform all activities of daily living independently." (AR 885.) Dr. Huyck also opined that Bertram met the "Blue Book Criteria" for depression, but stated that the mental health records were not available to her and would need to be verified by Bertram's psychiatrist (Dr. Abney). (*Id.*) Although Dr. Abney was more qualified on the issue of Bertram's depression than Dr. Huyck, and although substantial evidence does not support Dr. Huyck's opinion that Bertram met the criteria for Listing 1.04 (for the reasons discussed above), the ALJ provides no good reason why the opinions of Drs. Farrell and Atkins are worthy of more weight than those of Drs. Huyck and Tortolani regarding Bertram's physical impairments, considering that Drs. Farrell and Atkins had never examined Bertram and were psychological consultants who did not specialize in back issues.

Therefore, I find that the ALJ erred in his analysis of the medical opinions, and I recommend remanding for a new analysis.

**IV.     On remand, the ALJ should reassess Bertram's credibility and ability to return to his past relevant work as a real estate broker.**

In light of the above findings and the need to remand for a new analysis of the medical opinions and of whether Bertram engaged in SGA during the relevant period, the Court need not reach Bertram's remaining arguments that the ALJ improperly assessed his credibility and erred in determining that he could return to his past relevant work as a real estate broker. I do note, however, that the ALJ appears to have selected facts from

the record which depict Bertram as having a more active lifestyle than he actually had.

The record taken as a whole—giving weight to Dr. Abney's, Dr. Huyck's, and Dr.

Tortolani's opinions and treatment notes, and considering Bertram's Function Reports

and testimony at the administrative hearings—demonstrates that, although Bertram tried

to remain active and continued to work on a part-time basis, he was significantly limited

by pain and depression. (*See, e.g.*, AR 51–53, 70–73, 76–77, 81, 444, 464, 656, 884–86.)

*See* SSR 96-7p, 1996 WL 374186, at *4 (July 2, 1996) ("When evaluating the credibility

of an individual's statements, the adjudicator must consider the entire case record and

give specific reasons for the weight given to the individual's statements.").

### Conclusion

For these reasons, I recommend that Bertram's motion (Doc. 4) be GRANTED, in

part; the Commissioner's motion (Doc. 8) be DENIED; and the matter be REMANDED

for further proceedings and a new decision in accordance with this ruling.  Bertram

requests that, instead of remanding for further proceedings, the Court should reverse and

remand solely for calculation of benefits.  But in cases where there are gaps in the

administrative record or, as here, the ALJ has applied an improper legal standard, it is

more appropriate to remand for further proceedings and a new decision.  *Rosa v.*

*Callahan*, 168 F.3d 72, 82–83 (2d Cir. 1999); *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir.

1996).  Thus, I recommend DENYING Bertram's request that the matter be reversed and

remanded solely for calculation of benefits.

Finally, Bertram suggests that a different ALJ should be assigned on remand.

(Doc. 4 at 20.)  I recommend denying the request, as there is no indication that ALJ

Merrill engaged in any conduct warranting remand to a different ALJ.  *See Johnson v. Astrue*, Civil No. 3:10–CV–1023 (VLB), 2011 WL 2938074, at *2 (D. Conn. Feb. 15, 2011) ("when the conduct of an ALJ gives rise to serious concerns about the fundamental fairness of the disability review process, remand to a new ALJ is appropriate").  There is no evidence of bias, hostility, or prejudice by the ALJ towards Bertram.  *See Sutherland v. Barnhart*, 322 F. Supp. 2d 282, 293 (E.D.N.Y. 2004) (remand to new ALJ justified where ALJ exhibited "personal hostility" towards plaintiff).  Nonetheless, the Commissioner retains discretion to make an assignment to a different ALJ on remand if she so chooses.  *See Johnson*, 2011 WL 2938074, at *2 (taking no position on which ALJ should be assigned to the case on remand, and noting that (a) there was "no evidence that the ALJ acted due to apparent hostility toward Ms. Johnson"; and (b) "simply failing to adhere to the appropriate legal standard during the first hearing does not clearly indicate that the ALJ would not apply the correct standard on remand").

Dated at Burlington, in the District of Vermont, this 10th day of June, 2015.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b)(2); L.R. 72(c). Failure to timely file such objections "operates as a waiver of any further judicial review of the magistrate's decision."  *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).